| ✎B104<br>(Rev. 2/92) | **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|---|

| **PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Peter J. Campbell | Michael K. Molen |

| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Mitchell S. Rosen      (404) 231-9397<br>Foltz Martin, LLC<br>Five Piedmont Center, Suite 750<br>Atlanta, Georgia 30305-1541 | **ATTORNEYS** (If Known)<br>Wynn Pelham        (770) 963-3328<br>Wynn Pelham, P.C.<br>5 Hurricane Shoals - Suite A<br>Lawrenceville, Georgia 30045 |
|---|---|

**PARTY** (Check one box only)    ☐ 1 U.S. PLAINTIFF    ☐ 2 U.S. DEFENDANT    ☒ 3 U.S. NOT A PARTY

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Objection to discharge and to dischargeability of debt

## NATURE OF SUIT
(Check the one most appropriate box only.)

☐ **454** To recover money or property

☐ **435** To determine validity, priority, or extent of a lien or other interest in property

☐ **458** To obtain approval for the sale of both the interest of the estate and of a co-owner in property

☒ **424** To object or to revoke a discharge 11 U.S.C. § 727

☐ **455** To revoke an order of confirmation of a Chap. 11, Chap. 12, or Chap. 13 Plan

☒ **426** To determine the dischargeability of a debt 11 U.S.C. § 523

☐ **434** To obtain an injunction or other equitable relief

☐ **457** To subordinate any allowed claim or interest except where such subordination is provided in a plan

☐ **456** To obtain a declaratory judgment relating to any of the foregoing of action

☐ **459** To determine a claim or cause of action removed to a bankruptcy court

☐ **498** Other (specify)

| **ORIGIN OF PROCEEDINGS**<br>(Check one box only.) | ☒ 1 Original Proceeding | ☐ 2 Removed Proceeding | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another Bankruptcy Court | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 |
|---|---|---|---|---|---|

| **DEMAND** | NEAREST THOUSAND<br>$  319,000 | OTHER RELIEF SOUGHT | | ☐ JURY DEMAND |
|---|---|---|---|---|

## BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

| NAME OF DEBTOR<br>Michael K. Molen | BANKRUPTCY CASE NO.<br>03-67853-MHM |
|---|---|
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Georgia | DIVISIONAL OFFICE<br>Atlanta Division | NAME OF JUDGE<br>Margaret H. Murphy |

## RELATED ADVERSARY PROCEEDING (IF ANY)

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| DISTRICT | DIVISIONAL OFFICE | NAME OF JUDGE |

**FILING FEE**    (Check one box only.)    ☒    FEE ATTACHED    ☐ FEE NOT REQUIRED    ☐ FEE IS DEFERRED

| DATE<br>09/08/03 | PRINT NAME<br>Mitchell S. Rosen | SIGNATURE OF ATTORNEY (OR PLAINTIFF) |
|---|---|---|

B 104 Reverse

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re:<br><br>MICHAEL K. MOLEN,<br><br>         Debtor.<br>--------------------------------------------------<br>PETER J. CAMPBELL,<br><br>         Plaintiff,<br><br>v.<br><br>MICHAEL K. MOLEN,<br><br>         Defendant. | Case No. 03-67853-MHM<br>Chapter 7<br>Judge Murphy<br><br><br><br>Adversary Proceeding<br>No. _____ |

## COMPLAINT TO DENY DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 727 AND TO OBJECT TO DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523

COMES NOW, PLAINTIFF PETER J. CAMPBELL ("Campbell"), and for his Complaint to Deny Debtor's Discharge Pursuant to 11 U.S.C. § 727 and to Object to Dischargeability of Debt Pursuant to 11 U.S.C. § 523 states as follows:

### JURISDICTION

1.      Jurisdiction to adjudicate this matter is vested in this Court pursuant to 28 U.S.C. § 1334. This adversary proceeding is properly before this Honorable Court pursuant to 28 U.S.C. § 157(a). This action is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 157(b)(2)(J).

2.      September 8, 2003 is the last day to file a complaint to object to discharge of the Debtor under 11 U.S.C. § 727 and to determine dischargeability of debt under 11 U.S.C. § 523. Therefore, this Complaint has been filed in a timely manner.

**PARTIES**

3.      MICHAEL K. MOLEN ("Molen" or "Debtor") is an individual resident of the
State of Georgia who is subject to the jurisdiction and venue of this Court.  Molen filed a
petition pursuant to Chapter 7 of title 11 in this Court on June 3, 2003.

4.      CAMPBELL is a resident of North Carolina.

**FACTS**

5.      In November 2000, Molen and his wife refinanced funds previously obtained
from Campbell and signed a written promissory note in the amount of $235,945.94, a copy of
which is attached as Exhibit "1" (the "Promissory Note").

6.      In December 2001, Molen and his wife and Campbell and his wife entered
into that certain First Amendment to the Promissory Note, a copy of which is attached as
Exhibit "2" hereto ("First Amendment"), whereby the Promissory Note, which had been in
default for non-payment, was extended and secured by stock in an entity known as Sanswire,
Inc. ("Sanswire").  Molen and his wife agreed to pay the Promissory Note as amended on or
before July 30, 2002.  (The Promissory Note and the First Amendment are hereinafter
referred to as the "Amended Note".)

7.      Neither Molen nor his wife paid the Amended Note.  Upon information and
belief, Molen had no intention of paying the Amended Note at any time.

8.      The current amount outstanding under the Amended Note, including interest,
exceeds $307,000.00.  Default interest continues to run at the per diem rate of $77.57.

9.      At all times relevant hereto, Molen was the majority shareholder and president
of Sanswire and in control of Sanswire.

10.     Molen neither issued, nor caused Sanswire to issue, to Campbell any stock in
Sanswire despite repeated detailed requests for the stock. (See Exhibit "3" attached).  Upon

information and belief, Molen had no intention of issuing the stock at the time the First Amendment was entered into.  In an email to Campbell, Molen wrote the following:

> Just because you pledge something as collateral for a loan, it doesn't mean that when the payment is in default, the lender can just walk in and take the collateral. A judge must decide this.  (See Exhibit "4")

11.     At the 341 hearing in this case, Campbell questioned Molen as to why the Sanswire stock had never been issued.  After Molen failed to give an adequate answer to Campbell's question, the Trustee instructed Molen to meet with Campbell immediately after the hearing.  Campbell waited for Molen, but Molen hurried out of the courtroom, and the two did not meet.

12.     Subsequently, in an attempt to threaten Campbell to drop a suit against Molen's wife (who was a co-signor of the Amended Note), and to not file "any kind of action with the Bankruptcy Court," Molen threatened that he would "instruct Mr. Leinwald [counsel for Sanswire] that he is NOT to issue a single share of stock concerning this matter."  (See Exhibit "5")

13.     In the Schedules filed with this Court, Molen has stated that he owns stock in WRS, Inc. ("WRS"), and that the value of such stock is "0".  In that certain Pledge Agreement that was entered into by Molen in connection with the Amended Note (a copy of which is attached as Exhibit "6"), Molen warrants that he is the sole owner of WRS, and that WRS owns shares of stock in Sanswire with a value of at least $1,200,000.  In addition, Sanswire is a public company, and its stock as of the date hereof, is trading at a value of $0.12 per share.

14.     Molen executed a Promissory Note dated January 1, 2002, payable to Campbell, in the original principal amount of $10,000, a copy of which is attached as Exhibit "7" ("$10,000 Note").

15.    The $10,000 Note is currently in default for failure to make any payments.

16.    The $10,000 Note was also secured by stock Molen held in Sanswire through WRS, which stock Molen neither issued nor caused to be issued.

17.    Molen failed to list the $10,000 Note as a debt owed by the Debtor.

18.    In the Schedules filed with this Court, Molen has stated falsely that he has no secured creditors.

19.    In various papers filed with this Court, and at Molen's deposition taken on April 4, 2000, (in a connection with a suit filed by Campbell for failure to pay another promissory note against another one of Molen's companies, International Wireless Telecommunications, L.L.C. (the "Deposition")), Molen testified under oath that did not own, beneficially or otherwise, any real estate. In connection with another investment by Campbell in Sanswire, however, Molen enticed Campbell to loan Sanswire $156,000 by securing the loan with a second mortgage to the house that Molen currently lives in located on Mansions Parkway in Duluth, Georgia. (See copy of Promissory Note and Deed to Secure Debt and Security Agreement attached as Exhibits "8" and "9"[1]). Furthermore, in March, 2003, when Campbell commenced foreclosure proceedings against Molen's house on Mansions Parkway, Molen expressed surprise that Campbell would "take his house." (See Exhibit "10") Molen subsequently caused Sanswire to pay to Campbell the sum of $15,000 if Campbell would suspend the foreclosure proceedings. (See Exhibit "11")

20.    In the Statement of Financial Affairs filed with this Court, Molen claimed that he has had no income since 2001. In his Deposition, Molen testified under oath that he received no salary from Sanswire, but that he did receive payments that he called loans. Under the terms of the promissory note executed by Sanswire in April of 2002 in connection

---

[1]    Exhibit "9" has been redacted to include only those pages with relevant information.

with Campbell's $156,000 investment into Sanswire (the "156,000 Note"), Campbell was to receive, weekly, 50% of any income received by Sanswire from the prior week until the $156,000 Note was paid in full. Except with respect to the payment referenced in the preceding paragraph, Campbell has not received payments under the $156,000 Note, although Molen has received cash "loaned" from Sanswire during this time. Upon information and belief, without making any payments to Campbell, Molen has raised additional cash or cash value from third parties from the issuance of or promises to issue additional stock.

21.     In an email to Campbell providing an update to shareholders of Sanswire, Molen stated that "The project in Miami that I was telling you about has come to fruition. We landed the eight high-rise apartment buildings that have over 2000 tenants. Our engineers will be in Miami on Monday to perform the site survey. This is a very lucrative deal for Sanswire…" This project never happened. In the same memo, two other projects, both in Ecuador (one with the Navy, providing internet access to 27 buildings, and the other with Pacific Tel) also never happened. (See Exhibit "12" attached.)

22.     In his dealings with Campbell as an investor in Sanswire, Molen held himself out to be the majority shareholder in Sanswire. (See email from Molen attached as Exhibit "13" hereto). At the 341 hearing, however, in response to a question regarding other stockholders of Sanswire, Molen responded that Helmut Wyzisk was the largest shareholder and owned approximately 66% of Sanswire.

23.     In his dealings with Campbell, both in seeking new financing money and communicating with Campbell as an existing investor, Molen generally described Sanswire as being on the edge of the next great deal that would fully fund Sanswire and allow it to take

off.  Of his daily duties, Molen  wrote that "I spend every day of my life *whoring* myself to investors to keep the door at Sanswire open".  (See Exhibit "14")(emphasis added)

24.    Three months prior to filing  his petition, Molen provided Campbell with a copy of a business plan he used to try to obtain $500,000 from potential investors.  The business plan, a copy of which is  attached as Exhibit "15,"[2] shows Molen  would be paid a salary of $200,000 as CEO, but fails to show the debts to Campbell, or any contingency for litigation, pending or threatened, by any of the creditors listed in the Petition.

## COUNT I
## OBJECTION TO DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 523(a)(2)(A)

25.    Plaintiff realleges and incorporates by reference the allegations of Paragraphs 1 through 24 above.

26.    Molen  obtained  money  from  Campbell  by  false  pretenses,  false representations and actual fraud and has avoided paying the debt through continued false pretenses, false representations and continuing actual fraud.

27.    Molen's actions constitute grounds  for excepting this debt from discharge under 11 U.S.C. § 523(a)(2)(A).

## COUNT II
## OBJECTION TO DEBTOR'S DISCHARGE  PURSUANT TO 11 U.S.C. § 523(a)(4)

28.    Plaintiff realleges and incorporates by reference the allegations of Paragraphs 1 through 27 above.

29.    Molen's actions constitute fraud or defalcation while acting in a fiduciary capacity.

30.    Molen's actions constitute grounds  for excepting this debt from discharge under 11 U.S.C. § 523(a)(4).

---

[2]    Exhibit "15" has been redacted to include only that page with relevant information.

## COUNT III
## OBJECTION TO DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 727(a)(2)

31.     Plaintiff realleges and incorporates by reference the allegations of Paragraphs 1 through 30 above.

32.     Molen, with intent to hinder, delay or defraud Plaintiff and other creditors and the Bankruptcy Trustee, has concealed property of the Debtor within one year prior to filing the petition with this Court and property with the estate after the date of filing the petition with this Court.

33.     Molen's actions constitute grounds for denying the Debtor a discharge pursuant to 11 U.S.C. § 727(a)(2).

## COUNT IV
## OBJECTION TO DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 727(a)(3)

34.     Plaintiff realleges and incorporates by reference the allegations of Paragraphs 1 through 31 above.

35.     Molen has concealed, falsified or failed to keep records from which the Debtor's financial condition or business transactions might be ascertained, and such actions are not justified under the circumstances of this case.

36.     Molen's actions constitute grounds for denying the Debtor a discharge under 11 U.S.C. § 727(a)(3).

## COUNT V
## OBJECTION TO DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 727(a)(4)

37.     Plaintiff realleges and incorporates by reference the allegations of Paragraphs 1 through 36 above.

38.     Upon information and belief, Molen has knowingly and fraudulently made a false oath or account, or withheld information, from the Bankruptcy Trustee in or in connection with this case.

39.     Molen's actions constitute grounds for denying the Debtor a discharge pursuant to 11 U.S.C. § 727(a)(4).

## PRAYER FOR RELIEF

NOW THEREFORE, Plaintiff Peter J. Campbell requests that this Court enter an order denying Defendant Michael K. Molen a discharge, granting a non-dischargeable judgment in favor of Campbell against Molen in an amount to be proven at trial, and granting such other and further relief as the Court deems just and proper.

Respectfully submitted this 8th day of September 2003.


_____/s/ Mitchell S. Rosen_____
Mitchell S. Rosen
Georgia Bar No. 614419


Attorney for Plaintiff Peter J. Campbell

**FOLTZMARTIN, LLC**
3525 Piedmont Road, NE
Five Piedmont Center, Suite 750
Atlanta, Georgia 30305-1541
Telephone:  (404) 231-9397
Facsimile:   (404) 237-1659

## CERTIFICATE OF SERVICE

This certifies that the undersigned has served a true and correct copy of the foregoing COMPLAINT TO DENY DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 727 AND TO OBJECT TO DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523 upon opposing counsel via first class United States Mail, proper postage affixed thereto, and addressed as follows:

Wynn Pelham, Esq.                     Office Of The United States Trustee
5 Hurricane Shoals – Suite A          75 Spring Street, SW – Suite 362
Lawrenceville, GA 30045               Atlanta, GA 30303

Michael Kent Molen
3610 Mansions Parkway
Duluth, GA 30096

This 8th day of September 2003.


        /s/ Mitchell S. Rosen
Mitchell S. Rosen
Georgia Bar No. 614419


Attorneys for Plaintiff Peter J. Campbell

**FOLTZMARTIN, LLC**
3525 Piedmont Road, NE
Five Piedmont Center, Suite 750
Atlanta, Georgia 30305-1541
Telephone: (404) 231-9397
Facsimile:  (404) 237-1659

# Exhibit "1"

# PROMISSORY NOTE

$235,945.94                                                         November 22, 2000
Atlanta, Georgia

FOR VALUE RECEIVED, the undersigned, Michael K. Molen and Drusilla Molen, each individual residents of the state of Georgia (the "Borrowers"), promises to pay to the order of PETER CAMPBELL, an individual resident of the state of North Carolina,(herein the "Lender" and, along with each subsequent holder of this Note, referred to as the "Holder"), at 4708 Oak Park Road, Raleigh, North Carolina 27612 the principal sum of Two Hundred Thirty Five, Nine Hundred Forty-Five Thousand, and 94/100 ($ 235,945.94), with interest on the outstanding principal balance of this Note from the date hereof until fully paid as hereinafter provided.

Until the principal of this Note is repaid in full, interest shall accrue on the unpaid portion of such principal at a rate of eight percent (8%) per annum.  Interest shall be computed on the basis of a 365 day year and actual days elapsed.  Payments under this Note shall be made in lawful money of the United States of America.

Principal and accrued and unpaid interest due under this Note shall be due payable on January 31, 2001 ("Maturity Date").  The Borrowers may prepay this Note in full or in part at any time without notice, penalty, prepayment fee, or payment of unearned interest.  All payments hereunder received from the Borrowers by the Holder shall be applied first to interest to the extent then accrued and then to principal, with prepayments of principal being applied in inverse order of maturity.

The Maturity Date may be extended for an additional period of ninety (90) days provided that (i) the Borrowers request such extension in writing to the Holders at least 10 days prior to January 31, 2001, (ii) that the Borrower's pay to the Holders an extension fee of $5,000 per month for each month that the Maturity Date is extended (which amount shall be due on the first day of each month, commencing February 1, 2001) and (iii) that the Borrowers are not in, and have never been in default of any term of this Agreement or that certain Settlement Agreement, by and among Borrowers and Holders, dated as of even date herewith, or any document attached thereto.  Failure to make any payment of the extension fee when due shall cause an immediate termination of the extended period, and all sums due the Holders under this Promissory Note shall become immediately due and payable without any further action or notice on the part of the Holder.

This Note is secured by a Pledge Agreement of even date herewith executed by the Borrowers, and pledging certain of Borrowers' (or any entity or person on behalf of the Borrowers') interest in stock of IWT, Sanswire.Net L.L.C. or any successor company it may merge with or into, or any related company thereto, in accordance with the terms provided therein (the "Pledge Agreement").

All parties liable for the payment of this Note agree to pay the Holder hereof an amount equal to 15% of the principal and interest outstanding as attorneys' fees for the services of counsel employed to collect this Note, whether or not suit be brought, and whether incurred in connection with collection, trial, appeal, or otherwise, and to indemnify and hold the Holder harmless against liability for the payment of state intangible, documentary and recording taxes, and other taxes (including interest and penalties, if any) which may be determined to be payable with respect to this transaction.

In no event shall the amount of interest due or payable hereunder exceed the maximum rate of interest allowed by applicable law, and in the event any such payment is inadvertently paid by the Borrowers or inadvertently received by the Holder, then such excess sum shall be credited as a payment of principal, unless the Borrowers shall notify the Holder, in writing, that the Borrowers elects to have such excess sum returned to it forthwith.  It is the express intent hereof that the Borrowers not pay and the Holder not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by the Borrowers under applicable law.

The remedies of the Holder as provided herein and in the Pledge Agreement or any other documents governing or securing repayment hereof shall be cumulative and concurrent and may be pursued singly, successively, or together, at the sole discretion of the Holder, and may be exercised as often as occasion therefor shall arise.

Any failure by the Holder to exercise any right, remedy, or recourse shall not be deemed a waiver of such right, remedy or recourse unless set forth in a written document executed by the Holder, and then only to the extent specifically recited therein.  A waiver or release with reference to one event shall not be construed as continuing, as a bar to, or as a waiver or release of any subsequent right, remedy, or recourse as to any subsequent event.

The Borrowers hereby (a) waive demand, presentment of payment, notice of nonpayment, protest, notice of protest and all other notice, filing of suit, and diligence in collecting this Note, or in enforcing any of its rights under the Pledge Agreement or other guaranties securing the repayment hereof; (b) agree to any substitution, addition, or release of any collateral or any party or person primarily or secondarily liable hereon; (c) agree that the Holder shall not be required first to institute any suit, or to exhaust his, their, or its remedies against the Borrowers or any other person or party to become liable hereunder, or against any collateral in order to enforce payment of this Note; (d) consent to any extension, rearrangement, renewal, or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice, consent, or consideration to any of them; and (e) agree that, notwithstanding the occurrence of any of the foregoing (except with the express written release by the Holder or any such person), they shall be and remain jointly and severally, directly, and primarily, liable for all sums due under this Note.

The Borrowers and all endorsers or other parties to this Note severally waive, each for himself or herself,  and their family, to the maximum extent permitted by applicable law, any and all homestead and exemption rights which any of them or the family of any of them may have

under or by virtue of the Constitution or laws of the United States of America or of any state as against this Note, any renewal hereof, or any indebtedness represented hereby.

Whenever used in this Note, the words "Borrower" and "Holder" shall be deemed to include the Borrowers and the Holder named in the opening paragraph of this Note, and their respective heirs, executors, administrators, legal representatives, successors and assigns. It is expressly understood and agreed that the Holder shall never be construed for any purpose as a partner, joint venturer, co-principal, or associate of the Borrowers, or of any person or party claiming by, through, or under the Borrowers in the conduct of their respective businesses.

Time is of the essence of this Note.

This Note shall be construed and enforced in accordance with the laws of the State of Georgia.

The pronouns used herein shall include, when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.

All references herein to any document, instrument, or agreement shall be deemed to refer to such document, instrument, or agreement as the same may be amended, modified, restated, supplemented, or replaced from time to time.

IN WITNESS WHEREOF, the undersigned Borrowers has executed this instrument, under seal, as of the day and year first above written.

MICHAEL K. MOLEN

DRUSILLA MOLEN

# Exhibit "2"

Execution Copy

### FIRST AMENDMENT TO
### $235,954.94 PROMISSORY NOTE
### FROM MICHAEL AND DRUSILLA MOLEN
### TO PETER CAMPBELL

THIS FIRST AMENDMENT TO PROMISSORY NOTE ("First Amendment") is made effective as of the 31st day of December, 2001, by and between Michael K. Molen ("Molen"), representing himself and his wife, Drusilla Molen ( Molen and his wife, collectively referred to as the "Obligors") and to Peter Campbell ("Campbell"), representing himself and his wife, Helaine Campbell (Campbell and his wife collectively referred to as the "Lenders").

WHEREAS, pursuant to that certain Promissory Note dated November 22, 2000, in the original principal amount of $235,945.94 ("Promissory Note"), the "Obligors are each obligated to pay to Lenders) all amounts due thereunder.

WHEREAS, the Promissory Note is currently in default;

WHEREAS, Lenders are willing to cap the interest that has accrued on the Promissory Note as of the date of the effective date of this First, and to waive the current default under the Promissory Note and extend its maturity date as provided hereunder;

WHEREAS, the Michael Molen is willing to provide additional security for the repayment of the Promissory Note, and to enter into a new Promissory Note effective as of even date herewith for the balance of the interest due till maturity;

NOW, THEREFORE, BE IT RESOLVED, that in consideration of the premises, and other consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:



1.  <u>Cap of Interest on Promissory Note</u>:  The parties agree that the interest under the Promissory Note shall accrue and be payable through December 31, 2001, provided that the full amount of the Promissory Note, and all interest accrued through December 31, 2001 in the amount of $256,83.47 is paid on or before July 30, 2002.

2.  <u>Waiver of Default</u>:  The Lenders agree to waive the Obligor's default in failure to pay amounts due under the Promissory Note until July 30, 2002.

3.  <u>Pledge of Stock in Sanswire, Inc.</u>:  In consideration of the waiver of default, Molen agrees to provide as additional security for the payment of the Promissory Note, a pledge of stock in Sanswire, Inc. in accordance with that certain Pledge Agreement dated as of even date herewith, a copy of which is attached hereto as Exhibit A.

4.  <u>Default:</u>  In the event that the full amount of the Promissory Note is not paid in full on or before July 30, 2002, the Promissory Note shall be in default, and interest under the Promissory Note shall resume at the default rate of 12% until paid in full.

5.  <u>Authority:</u>  Each of the Campbell and Molen represent and warrant to each other that each has the authority and permission to enter into this First Amendment and agree to the terms provided herein on behalf of their respective spouses.


IN WITNESS WHEROF, the parties hereto have executed this Agreement under seal as of the date first written above.


Michael K. Molen, for himself
and Drusilla Molen.

Peter J. Campbell, for himself
and Helaine Campbell.

Execution Copy

4.  <u>Default:</u>  In the event that the full amount of the Promissory Note is not paid in full on or before July 30, 2002, the Promissory Note shall be in default, and interest under the Promissory Note shall resume at the default rate of 12% until paid in full.

5.  <u>Authority:</u>  Each of the Campbell and Molen represent and warrant to each other that each has the authority and permission to enter into this First Amendment and agree to the terms provided herein on behalf of their respective spouses.

IN WITNESS WHEROF, the parties hereto have executed this Agreement under seal as of the date first written above.

_____
Michael K. Molen, for himself
and Drusilla Molen.

*Peter J Campbell*
Peter J. Campbell, for himself
and Helaine Campbell.

Exhibit "3"

Michael K. Molen
CEO
Sanswire Technologies, Inc.


---------- Original Message ----------------------------------
From: "Jeff Woodward" <JWoodward@FoltzMartin.com>
Reply-To: <JWoodward@FoltzMartin.com>
Date:  Wed, 15 Jan 2003 11:54:36 -0500

>Mike, per your request, here is Pete's email message.
>
>-----Original Message-----
>From: Camp99999@aol.com [mailto:Camp99999@aol.com]
>Sent: Tuesday, January 14, 2003 10:21 PM
>To: mmolen@sanswire.com
>Cc: jwoodward@foltzmartin.com; campbell.jmj@usa.net
>Subject: Campbell URGENT Message
>
>
>Mike,
>      Let's make this my last URGENT message! I refuse to get on your
>merry-go-round one more time. You have chosen not to call today, as
>promised, or send a suggested plan as we discussed yesterday. Let me be
>clear on our situation as I attempted to be yesterday in our phone
>conversation. I want those certificates now. You are the CEO, you make the
>decision and have them issued. You told me in September that Stephen &
>Jonathan knew I needed the money immediately and were doing everything
>possible to get it to me ASAP. I give them an "F" in accomplishment and
>don't need any more of this kind of help.
>      This is the time for you to clean up administrative items that you
>have permitted to accumulate for whatever reasons. Specifically I want
>certificates issued to:
>      1. Peter J. Campbell SS# 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 for 4.75% of the free trading
>company stock as collateral for Loan #1.
>      2. Peter J. Campbell SS# 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 for 1% of free trading company
>stock as collateral for Loan #2.
>      3. Peter J. Campbell SS# 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 for 3% of free trading company
>stock as per Agreement dated November 20, 2002.
>      4. Helaine P. Campbell 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 for 3% of free trading company
>stock as per Agreement dated November 20, 2002
>      5. T. J. Lystad SS# 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 for 25,000 shares as per our
>agreement.
>
>      I request that instructions be wired to the Transfer Agent along with
>whatever else needs to be sent to the Agent to have him issues these
>certificates promptly. In addition, I would like a copy of these
>instructions faxed or Emailed to me, with an estimated date of certificate
>delivery, and copies delivered to Jeff.
>      These should be delivered to Jeff's office by 5 PM tomorrow,
>Wednesday, January 15 along with:
>      a. original signed copy of $11k Note
>      b. original signed copy of 200K Warrants
>      c. original signed copy of November 20, 2002 Agreement
>It would be appropriate to call Jeff prior to going over. His number is
>404-231-9397.
>Mike, time is short for obvious reasons. On Thursday morning I will check to

# Exhibit "4"

Page 1 of 2

| | |
|---|---|
| Subj: | **Re: Campbell Nov 18, 2001** |
| Date: | 11/18/01 9:04:02 PM Eastern Standard Time |
| From: | mmolen@sanswire.net (Michael Molen) |
| Reply-to: | mmolen@sanswire.net |
| To: | Camp99999@aol.com |

I'm sorry Pete for the delay in getting the information to you.
We made several changes to the Business Plan and the new pages
weren't finished until this weekend.  Your copy will be sent out
on Monday.  I received your message with your son's address.  We
will send it there.

I am preparing a response to Spike's email and will send you a
copy as well.

I know that it looks like I don't communicate very well.  I admit
that this is not one of my strong suits, but this is the busiest
we have ever been and things (everything) are taking longer than
expected.

I spent most of the weekend at the office with Noah working on our
answer to Larry's suit as well as our counter suit.  I'll forward
a copy of both to you as soon as the final copy is given to me.

One thing about Spike's email:  Just because you pledge something
as collateral for a loan, it doesn't mean that when the payment is
in default, the lender can just walk in and take the collateral.
A judge must decide this.  There are steps to go through that he
(Spike) has not gone through yet.  I hope that my response will
give him a bit more comfort than he has now.

Have a safe trip.  Perhaps we could speak on Monday.

Best regards,

MM


Michael K. Molen
President/CEO
Sanswire.Net



--------- Original Message ------------------------------
From: Camp99999@aol.com
Date: Sun, 18 Nov 2001 20:40:42 EST

>Mike,
>     Last week you said you would be sending some of the
requested
>information to Spike and me. When should we receive it?
>     Spike's Email, of today, plainly expresses our great
concern at not
>getting responses.
>Pete c.
>
>

Monday, November 19, 2001     America Online: Camp99999

# Exhibit "5"

September 4, 2003

TO: PETE CAMPBELL

RE: SETTLEMENT OFFER

Pete,

In order to settle "all" matters between us, I'd like to make the following proposal:

I will immediately produce the necessary documentation to cause One Million Eight Hundred Fifty Nine Thousand One Hundred Sixty Six shares of Sanswire Technologies, Inc. common stock to be issued to you. You will have the stock certificate within 10 days. These shares represent approximately 9% of the total issued and outstanding shares of Sanswire.

I will also have Jonathan Leinwand send a letter to you within 24 hours confirming the shares are being issued.

You will immediately drop the frivolous law suit you filed against my wife within a few days of her mother's death.

You will not file any kind of action with the bankruptcy court.

You will agree to these terms "without" input or comment from Jeff Woodward. If Mr. Woodward is involved in "any" way, this offer is rescinded.

These terms are not negotiable. If you choose not to accept this proposal, we will prepare to vigorously defend the legal action filed against my wife. You are free to file any kind of action with the bankruptcy court. However, please understand that if something frivolous is filed with the bankruptcy court, I will defend my position with all means available to me. I will also instruct Mr. Leinwand that he is NOT to issue a single share of stock concerning this matter.

*(This proposal is for discussion only and is not binding until both parties agree to the terms herein)*

# Exhibit "6"

Execution Copy

# PLEDGE AGREEMENT
### (To Secure $235,954.94 Promissory Note and to Secure $10,911.69 Promissory Note)

This PLEDGE AGREEMENT is made as of the 12 day of April, 2002 by and among Michael K. Molen, an individual resident of the state of Georgia, ("Molen"), WRS, Inc., a Delaware corporation ("WRS") (hereinafter called the "Pledgor"), and Peter J. Campbell, an individual resident of the state of North Carolina ("Campbell") (hereinafter called the "Pledgee").

WHEREAS, Molen and his wife have entered into that certain Promissory Note dated as of November 22, 2000 in the original principal amount of $235,954.94, as amended by that certain First Amendment to the Promissory Note dated as of even date herewith (the "Promissory Note No.1");

WHEREAS, Molen has entered into that certain Promissory Note dated as of even date herewith in the original principal amount of $10,911.69 (the "Promissory Note No.2");

WHEREAS, Molen wishes to cause WRS, a Delaware corporation wholly owned and controlled by Molen, to pledge a certain amount of the stock it holds in Sanswire, Inc., a Delaware corporation ("Sanswire") to Campbell in order to secure the amount due to Campbell under Promissory Note No.1 and Promissory Note No.2 (collectively referred to as the "Promissory Notes");

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows



**SECTION 1. Pledge.** As collateral security for payment of all amounts due to Campbell under the Promissory Notes, the Pledgor hereby pledges, hypothecates, assigns, transfers, sets over and delivers unto the Pledgee, (a) such number of shares of stock held by Pledgor in Sanswire equal to the greater of (i) four and three quarters percent (4.75%) of the issued and outstanding Sanswire stock, or (ii) current market value of $1,200,000 (collectively the "Pledged Stock"); and (b) any cash, additional stock or securities or other property at any time and from time to time receivable or otherwise distributable in respect of, in exchange for, or in substitution of, any and all such Pledged Stock, together with the proceeds thereof (all such Pledged Stock, securities, cash, property and other proceeds thereof being hereinafter collectively called the "Pledged Collateral"). Upon delivery to the Pledgee, (a) any securities now or hereafter included in the Pledged Collateral (the "Pledged Securities") shall be accompanied by duly executed transfer certificates, duly endorsed in blank, and by such other instruments or documents as the Pledgee or its counsel may reasonably request, and (b) all other property comprising part of the Pledged Collateral shall be accompanied by proper instruments of assignment duly executed by the Pledgor and by such other instruments or documents as the Pledgee or its counsel may reasonably request

Execution Copy

TO HAVE AND TO HOLD the Pledged Collateral, together with all rights, titles, interests, powers, privileges and preferences pertaining or incidental thereto, unto the Pledgee, its successors and assigns, forever, subject, however, to the terms, covenants and conditions hereinafter set forth.

**SECTION 2. Obligations Secured.** This Pledge Agreement is made, and the security interest created hereby is granted to the Pledgee to secure payment in full of the amount due to Pledgee pursuant to the aforementioned Promissory Notes.

**SECTION 3. Representations and Warranties.** The Pledgor hereby represents and warrants that, except for the security interest granted to the Pledgee, the Pledgor is the legal and equitable owner of the Pledged Collateral, holds the same free and clear of all liens, charges, encumbrances and security interests of every kind and nature and will make no voluntary assignment, pledge, mortgage, hypothecation or transfer of the Pledged Collateral; that the Pledgor has good right and legal authority to pledge the Pledged Collateral in the manner hereby done or contemplated and will defend its title thereto against the claims of all persons whomsoever and that no consent or approval of any governmental body or regulatory authority, or of any securities exchange, was or is necessary to the validity of such pledge which has not been obtained; that the pledge of the Pledged Collateral is effective to vest in the Pledgee the rights of the Pledgee in the Pledged Collateral as set forth herein.

**SECTION 4. Release of Pledged Collateral.**

(a) Pledgor agrees that in the event any additional shares of Sanswire stock are issued which have the result of diluting or decreasing the Total Value of the Pledged Stock , the Pledgor shall immediately transfer to Pledgee such additional stock in Sanswire as to maintain the value described in Section 1(a) above.

(b) With prior written authorization by Pledgee, Pledgor may decide to sell any or all of the Pledged Collateral providing said proceeds are immediately paid to Pledgee. As soon as the Pledged Collateral is sold to raise the necessary funds to satisfy all amounts due under the Promissory Notes, the Pledgee shall immediately release any remaining Pledged Collateral to Pledgor.



**SECTION 5. Voting Rights; Dividends, etc.**

(a) So long as no Event of Default hereunder shall have occurred,

(i) the Pledgor shall be entitled to exercise any and all voting and/or consensual rights and powers with respect to the Pledged Stock for any purpose not inconsistent with the terms of this Pledge Agreement; provided, however, that the Pledgor shall not exercise, or refrain from exercising, any such right or power if any such action would have a material adverse effect on the fair market value of such Pledged Securities or any part thereof;

Execution Copy

(ii)    the Pledgee shall execute and deliver to the Pledgor, or cause to be executed and delivered to the Pledgor, as appropriate, all such proxies, powers of attorney, dividend orders and other instruments as the Pledgor may reasonably request for the purpose of enabling the Pledgor to exercise the voting and/or consensual rights and powers which Pledgor is entitled to exercise, if any, pursuant to paragraph (i) above.

(b) Upon the occurrence and during the continuance of an Event of Default hereunder, all rights of the Pledgor to exercise the voting and/or consensual rights and powers which Pledgor is entitled to exercise pursuant to paragraph (a)(i) above shall cease, and all such rights thereupon shall become vested in the Pledgee, which shall have the sole and exclusive right and authority to exercise such voting and/or consensual rights and powers which the Pledgor shall otherwise be entitled to exercise pursuant to paragraph (a)(i) above.  Any and all money and other property paid over to or received by the Pledgee pursuant to the provisions of this paragraph (b) shall be retained by the Pledgee as additional collateral hereunder and shall be applied in accordance with the provisions of Section 9 hereof.

**SECTION 6. Remedies upon Default.** If an Event of Default shall have occurred and be continuing, the Pledgee may sell, assign, transfer, endorse and deliver the whole or, from time to time, any part of the Pledged Collateral at public or private sale or on any securities exchange, for cash, upon credit or for other property, for immediate or future delivery, and for such price or prices and on such terms as the Pledgee in its discretion shall deem appropriate.  Upon consummation of any such sale the Pledgee shall have the right to assign, transfer, endorse and deliver to the purchaser or purchasers thereof the Pledged Collateral so sold.  Each such purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of the Pledgor, and the Pledgor hereby waives (to the extent permitted by law) all rights of redemption, stay and/or appraisal which the Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.  The Pledgee shall give the Pledgor ten days' written notice (which the Pledgor agrees is reasonable notification within the meaning of Section 9-504(3) of the Uniform Commercial Code as in effect in the State of Georgia) of the Pledgee's intention to make any such public or private sale or sale on any such securities exchange.  As an alternative to exercising the power of sale herein conferred upon it, the Pledgee may proceed by suit or suits at law or in equity to foreclose this Pledge Agreement and sell the Pledged Collateral or any portion thereof pursuant to judgment or decree of a court or courts having competent jurisdiction.  Any sale pursuant to this Section 6 shall conform to commercially reasonable standards as provided in Section 9-504(3) of the Uniform Commercial Code as in effect in the State of Georgia.



**SECTION 7. Pledgee Appointed Attorney-in-Fact.** The Pledgor hereby constitutes and appoints the Pledgee the attorney-in-fact of the Pledgor for the purpose of carrying out the provisions of this Pledge Agreement and taking any action and executing any instrument which the Pledgee may deem necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable and coupled with an interest.

**SECTION 8. Event of Default Defined.** For purposes of this Pledge Agreement, an "Event of Default" shall exist hereunder upon the happening of any of the following events:

Execution Copy

(a)     any written representation or warranty made in connection with this Pledge Agreement or the Promissory Notes shall prove false and misleading in any material respect;

(b)     any breach of any provision or obligation of Borrower under the Promissory Notes;

(c)     from and after the date hereof the Pledgor shall, or shall attempt to, encumber, subject to any further pledge or security interest, sell, transfer or otherwise dispose of any of the Pledged Collateral or any interest therein;

(d)     all or any part of the Pledged Collateral shall be attached or levied upon or seized in any legal proceedings, or held by virtue of any lien or distress;

(e)     the Pledgor shall fail to pay promptly all taxes and assessments upon any of the Pledged Collateral; or

(f)     the Pledgor shall fail to comply with any provision of this Pledge Agreement.

**SECTION 9.  Application of Proceeds of Sale and Cash.** The proceeds of any sale of the Pledged Collateral, whether in whole or in part, together with any other moneys held by the Pledgee under the provisions of this Pledge Agreement, shall be applied by the Pledgee as follows:

(a) first, to the payment of all costs and expenses incurred by the Pledgee in connection herewith, including but not limited to, all court costs and the fees and disbursements of counsel for the Pledgee in connection herewith, and to the repayment of all advances made by the Pledgee hereunder for the account of the Pledgor, and the payment of all costs and expenses paid or incurred by the Pledgee in connection with the exercise of any right or remedy hereunder; and

(b) second, to the payment in full of all other amounts due under the Promissory Notes.

Any amounts remaining after such application shall be promptly remitted to the Pledgor, its successors, legal representatives or assigns, or as otherwise provided by law. The Pledgee shall have absolute discretion as to the time of application of any proceeds in accordance with this Pledge Agreement.



**SECTION 10.  Further Assurances.** The Pledgor agrees that it will join with the Pledgee in executing and will file or record such notices, financing statements or other documents as may be necessary to the perfection of the security interest of the Pledgee hereunder.

**SECTION 11.  No Waiver.** No failure on the part of the Pledgee to exercise, and no delay on its part in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, or remedy preclude any other or the further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

Execution Copy

**SECTION 12.  Governing Law; Amendments.**  This Pledge Agreement has been executed and delivered in the State of Georgia and shall in all respects be construed in accordance with and governed by the laws of said State.  This Pledge Agreement may not be amended or modified nor may any of the Pledged Collateral be released or the security interest granted hereby extended, except in writing signed by the parties hereto.

**SECTION 13.  Binding Agreement; Assignment; Notices.**  This Pledge Agreement, and the terms, covenants and conditions hereof, shall be binding upon and inure to the benefit of the Pledgee and to all holders of the indebtedness secured hereby and their respective successors and assigns and to the Pledgor and its successors, legal representatives and assigns, except that the Pledgor shall not be permitted to assign this Pledge Agreement or any interest herein or in the Pledged Collateral, or any part thereof, or any cash or property held by the Pledgee as collateral under this Pledge Agreement.  No notice to or demand on the Pledgor shall entitle the Pledgor to any other or further notice or demand in the same, similar or other circumstances.  Any notice shall be conclusively deemed to have been received and shall be effective on the day on which delivered to the Pledgee or the Pledgor at their respective addresses.

**SECTION 14.  Headings.**  Section headings used herein are for convenience only and are not to affect the construction of or be taken into consideration in interpreting this Pledge Agreement.

**SECTION 15.  Counterparts.**  This Pledge Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which when taken together shall constitute but one and the same instrument.

     **IN WITNESS WHEREOF**, the parties hereto have caused this Pledge Agreement to be executed as of this ___day of April, 2002

PLEDGOR:                              PLEDGEE:

WRS, Inc.



_____       _____
Michael K. Molen, President            Peter J. Campbell

Execution Copy

**SECTION 12.  Governing Law; Amendments.**  This Pledge Agreement has been executed and delivered in the State of Georgia and shall in all respects be construed in accordance with and governed by the laws of said State.  This Pledge Agreement may not be amended or modified nor may any of the Pledged Collateral be released or the security interest granted hereby extended, except in writing signed by the parties hereto.

**SECTION 13.  Binding Agreement; Assignment; Notices.**  This Pledge Agreement, and the terms, covenants and conditions hereof, shall be binding upon and inure to the benefit of the Pledgee and to all holders of the indebtedness secured hereby and their respective successors and assigns and to the Pledgor and its successors, legal representatives and assigns, except that the Pledgor shall not be permitted to assign this Pledge Agreement or any interest herein or in the Pledged Collateral, or any part thereof, or any cash or property held by the Pledgee as collateral under this Pledge Agreement.  No notice to or demand on the Pledgor shall entitle the Pledgor to any other or further notice or demand in the same, similar or other circumstances.  Any notice shall be conclusively deemed to have been received and shall be effective on the day on which delivered to the Pledgee or the Pledgor at their respective addresses.

**SECTION 14.  Headings.**  Section headings used herein are for convenience only and are not to affect the construction of or be taken into consideration in interpreting this Pledge Agreement.

**SECTION 15.  Counterparts.**  This Pledge Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which when taken together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Pledge Agreement to be executed as of this ___ day of April, 2002

PLEDGOR:                                        PLEDGEE:

WRS, Inc.


_____                         *Peter J. Campbell*
Michael K. Molen, President                      Peter J. Campbell

# Exhibit "7"

Execution Copy

# PROMISSORY NOTE

**$10,911.69**
**Atlanta, Georgia**

**January 1, 2002**

FOR VALUE RECEIVED, the undersigned, Michael K. Molen, an individual resident of the state of Georgia (the "Borrower"), promises to pay to the order of Peter Campbell, an individual resident of the state of North Carolina (herein the "Lender" and, along with each subsequent holder of this Note, referred to as the "Holder", at 4708 Oak Park Road, Raleigh, North Carolina 27612 the principal sum of Ten Thousand Nine Hundred Eleven and 69/100 Dollars ($10,911.69), with interest on the outstanding principal balance of this Note from the date hereof until fully paid as hereinafter provided.

Until the principal of this Note is repaid in full, interest shall accrue on the unpaid portion of such principal at a rate of eight percent (8%) per annum. Interest shall be computed on the basis of a 365 day year and actual days elapsed. Payments under this Note shall be made in lawful money of the United States of America.

Principal and accrued and unpaid interest due under this Note shall be due payable on July 30, 2002 ("Maturity Date"). The Borrower may prepay this Note in full or in part at any time without notice, penalty, prepayment fee, or payment of unearned interest. All payments hereunder received from the Borrower by the Holder shall be applied first to interest to the extent then accrued and then to principal, with prepayments of principal being applied in inverse order of maturity.

This Note is secured by a Pledge Agreement dated as of even date herewith executed by WRS, Inc., a Delaware corporation solely owned by Michael K. Molen, and pledging certain of WRS' interest in the stock of Sanswire, Inc. in accordance with the terms provided therein (collectively, the "Pledge Agreements").

Borrower agrees to pay the Holder all reasonable attorneys' fees for the services of counsel employed to collect this Note, whether or not suit be brought, and whether incurred in connection with collection, trial, appeal, or otherwise, and to indemnify and hold the Holder harmless against liability for the payment of state intangible, documentary and recording taxes, and other taxes (including interest and penalties, if any) which may be determined to be payable with respect to this transaction.

In no event shall the amount of interest due or payable hereunder exceed the maximum rate of interest allowed by applicable law, and in the event any such payment is inadvertently paid by the Borrower or inadvertently received by the Holder, then such excess sum shall be credited as a payment of principal, unless the Borrower shall notify the Holder, in writing, that the Borrower elects to have such excess sum returned to it forthwith. It is the express intent hereof that the Borrower not pay and the Holder not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by the Borrower under applicable law.

Execution Copy

The remedies of the Holder as provided herein and in the Pledge Agreement or any other documents governing or securing repayment hereof shall be cumulative and concurrent and may be pursued singly, successively, or together, at the sole discretion of the Holder, and may be exercised as often as occasion therefor shall arise.

Any failure by the Holder to exercise any right, remedy, or recourse shall not be deemed a waiver of such right, remedy or recourse unless set forth in a written document executed by the Holder, and then only to the extent specifically recited therein. A waiver or release with reference to one event shall not be construed as continuing, is a bar to, or as a waiver or release of any subsequent right, remedy, or recourse as to any subsequent event.

The Borrower hereby (a) waives demand, presentment of payment, notice of nonpayment, protest, notice of protest and all other notice, filing of suit, and diligence in collecting this Note, or in enforcing any of its rights under the Pledge Agreement or other guaranties securing the repayment hereof; (b) agrees to any substitution, addition, or release of any collateral or any party or person primarily or secondarily liable hereon; (c) agrees that the Holder shall not be required first to institute any suit, or to exhaust his, their, or its remedies against the Borrower or any other person or party to become liable hereunder, or against any collateral in order to enforce payment of this Note; (d) consents to any extension, rearrangement, renewal, or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice, consent, or consideration to any of them; and (e) agrees that, notwithstanding the occurrence of any of the foregoing (except with the express written release by the Holder or any such person), Borrower shall be and remain directly, and primarily, liable for all sums due under this Note.

Whenever used in this Note, the words "Borrower" and "Holder" shall be deemed to include the Borrower and the Holder named in the opening paragraph of this Note, and their respective heirs, executors, administrators, legal representatives, successors and assigns. It is expressly understood and agreed that the Holder shall never be construed for any purpose as a partner, joint venturer, co-principal, or associate of the Borrower, or of any person or party claiming by, through, or under the Borrower in the conduct of their respective businesses.



Time is of the essence of this Note.

This Note shall be construed and enforced in accordance with the laws of the State of Georgia.

The pronouns used herein shall include, when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.

All references herein to any document, instrument, or agreement shall be deemed to refer to such document, instrument, or agreement as the same may be amended, modified, restated, supplemented, or replaced from time to time.

IN WITNESS WHEREOF, the undersigned Borrower has executed this instrument, under seal, as of the day and year first above written.

MICHAEL K. MOLEN

# Exhibit "8"

Execution Copy

# PROMISSORY NOTE

**$156,000**                                                            **April 8, 2002**

FOR VALUE RECEIVED, SANSWIRE, INC., a Delaware Corporation (the "Borrower") promises to pay to the order of Peter J. Campbell an individual resident of the state of North Carolina (the "Lender" and, along with each subsequent holder of this Note, referred to as the "Holder"), at 4708 Oak Park Road, Raleigh, North Carolina 27612, the principal sum of One Hundred Fifty Six Thousand ($156,000) Dollars, together with interest from the date hereof on the unpaid balance of principal on this Note until fully paid as provided herein.

WHEREAS, in order to create a public market for the sale of stock in the Borrower, the shareholders of the Borrower wish to merge and reorganize the Borrower itself with and into Pear Technologies, Inc. ("Pear Technologies") a public shell entity trading under the symbol "PEAR";

WHEREAS, as a part of the closing of the merger and reorganization ("Closing"), the Borrower will pay to the shareholders of Pear Technologies a purchase price that includes cash in the amount of $150,000 ("Purchase Cash") and stock in the reorganized entity equal to not more than 15% of the issued and outstanding stock of the merged company ("Reorganized Company");

WHEREAS, solely for the purpose of funding the cash portion of the Purchase Price Campbell has agreed to provide the amount of $150,000 to Sanswire, as a loan, to be paid to the shareholders of Pear Technologies at Closing in accordance with the terms and conditions provided herein;



## ARTICLE 1   The Loan

Section 1.1 <u>The Loan</u>. On the date hereof the Lender has advanced to the Borrower the principal amount of One Hundred Fifty Six Thousand ($156,000) Dollars (the "Loan") to be used in accordance with the purposes stated in the above recitals, which are incorporated as a part of this Note.

Section 1.2 <u>Interest</u>. Until the principal of this Note is repaid in full, interest shall accrue on the unpaid portion of such principal at a rate of eight percent (8%) per annum. Interest shall be computed on the basis of a 365-day year and actual days elapsed. Payments under this Note shall be made on lawful money of the United States.

Section 1.3 <u>Prepayment</u>. The Borrower may prepay this Note in full or in part at any time without notice, penalty, prepayment fee or payment of unearned interest. All payments hereunder received from the Borrower by the Holder shall be applied first to interest to the extent then accrued and then to principal, with payments of principal being applied in inverse order maturity.

Section 1.4 <u>Repayment</u>.  The principal balance of the Loan together with all accrued interest and other obligations then outstanding hereunder shall be paid as follows:

(a)    Starting on the second Friday after the Reorganized Company sells or transfers any shares (other than in connection with the merger and reorganization) and each Friday thereafter until the earlier of (i) the date the Loan is paid in full, or (ii) the Maturity Date (as hereinafter defined), Borrower will pay to Lender, by wire transfer to Lender's account, an amount equal to fifty percent (50%) of any (i) cash, or (ii) cash value of any other consideration that has been paid, on any stock, options, warrants, debentures or other interests in the Reorganized Company during the prior week.  Transfer shall take place prior to 1 PM on each Friday and shall be at the sole cost of Borrower.

(b)    On May 10, 2002 (the "Maturity Date") all amount remaining due and outstanding hereunder shall be paid in full.

Section 1.5 <u>Financial Information and Reports</u>:  During the time that any amount remains outstanding to Lender under this Note, Borrower will provide Lender the following reports and information by phone or Email each Thursday before noon, East Coast Time: (1) a weekly report on the stock sales and funding activities of the Reorganized Company.  Such report shall include, at a minimum information regarding the amount of stock sold or otherwise issued to date, sales, opening and closing prices, trading activity, revenue generated to date, and an estimate of the amount of money to be wired to Lender the following day, and (2) a weekly report and documentation on each discounted transfer of stock of the Reorganizd Company made to any broker; including discount price, number of shares, and sales records.

Section 1.6 <u>Collateral</u>.  This Note is secured by a Deed to Secure Debt and Security Agreement of even date herewith executed by Dan L. Wilcox (the "Security Agreement") granting a security interest in the property located at 3610 Mansions Parkway, Berkley Lake, Georgia 30096.



## ARTICLE 2  <u>Representations and Warranties</u>.

Section 2.1 <u>Borrower's Representations and Warranties</u>. The Borrower hereby represents and warrants in favor of the Lender that:

(a)    <u>Organization</u>. The Borrower is a corporation duly organized and validly existing under the laws of the State of Delaware.  The Borrower has the power and authority to own its properties and to carry on its business as now being and hereafter proposed to be conducted.

(b)    <u>Authorization</u>. The Borrower has the corporate power and has taken all necessary action to authorize it to borrow hereunder, to execute, deliver and perform this Note and any other loan documents to which it is a party in accordance with their respective terms, and to consummate the transaction contemplated herein and thereby. This Note has been duly executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with its terms.

## ARTICLE 3  Default and Remedies.

Section 3.1  Events of Default. Each of the following shall constitute an Event of Default, whatever the reason for such event and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment or order of any court or any order, rule or regulation of any governmental or non-governmental body:

    (a)    Failure by Borrower to make any payment to Lender hereunder when due;

    (b)    Any breach by Borrower of any provision of this Note or the Security Agreement;

    **(c)**    Any representation or warranty made under this Note shall prove materially incorrect or misleading in any material respect when made;

    **(d)**    There shall be entered and remain unseated a decree or order for relief in respect of the Borrower under Title XI of the United States Code as now constituted or hereafter amended, or any other applicable federal or state bankruptcy law or other similar law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Borrower, or of any substantial part of its properties, or ordering the winding up or a liquidation of the affairs of the Borrower; or an involuntary petition shall be filed against the Borrower and a temporary stay entered.

    (e)    The Borrower shall file a petition, answer or consent seeking relief under Title XI of the United States Code, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy law or any similar law or the Borrower shall consent to the institution of proceedings thereunder or to the filing of any such petition or shall seek, or consent to, the appointment or taking of possession of a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Borrower or of any substantial part of its properties, or the Borrower shall fail generally to pay any of is debts as they become due, or the Borrower shall take any action in furtherance of any such action.



Section 3.2  Remedies.

    (a)    If an Event of Default shall have occurred and be continuing, the Lender may formally declare that an Event of Default has occurred and declare the full amount of the Note outstanding to be immediately due and payable, and shall be permitted to immediately foreclose against the Collateral as provided in the Security Agreement.

    (b)    Any failure by the Holder to exercise any right, remedy, or recourse shall not be deemed a waiver of such right, remedy or recourse unless set forth in a written document executed by the Holder, and then only to the extent specifically recited therein.  A waiver or release with reference to one event shall not be construed as continuing, as a bar to, or as a waiver or release of any subsequent right, remedy, or recourse as to any subsequent event.

(c)    The Borrowers hereby (i) waive demand, presentment of payment, notice of nonpayment, protest, notice of protest and all other notice, filing of suit, and diligence in collecting this Note, or in enforcing any of its rights under the Security Agreement or other guaranties securing the repayment hereof; (ii) agree to any substitution, addition, or release of any collateral or any party or person primarily or secondarily liable hereon; (iii) agree that the Holder shall not be required first to institute any suit, or to exhaust his, their, or its remedies against the Borrowers or any other person or party to become liable hereunder, or against any collateral in order to enforce payment of this Note; (iv) consent to any extension, rearrangement, renewal, or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice, consent, or consideration to any of them; and (v) agree that, notwithstanding the occurrence of any of the foregoing (except with the express written release by the Holder or any such person), they shall be and remain jointly and severally, directly, and primarily, liable for all sums due under this Note.

(d)    The Borrowers and all endorsers or other parties to this Note severally waive, each for himself or herself, and their family, to the maximum extent permitted by applicable law, any and all homestead and exemption rights which any of them or the family of any of them may have under or by virtue of the Constitution or laws of the United States of America or of any state as against this Note, any renewal hereof, or any indebtedness represented hereby.

(e)    The remedies of the Holder as provided herein and in the Security Agreement or any other documents governing or securing repayment hereof shall be cumulative and concurrent and may be pursued singly, successively, or together, at the sole discretion of the Holder, and may be exercised as often as occasion therefor shall arise.

## ARTICLE 4   Other Terms.

Section 4.1  Miscellaneous.



(a)    Borrower agrees to pay the Holder all reasonable attorneys' fees for the services of counsel employed to collect this Note, whether or not suit be brought, and whether incurred in connection with collection, trial, appeal, or otherwise, and to indemnify and hold the Holder harmless against liability for the payment of state intangible, documentary and recording taxes, and other taxes (including interest and penalties, if any) which may be determined to be payable with respect to this transaction.

(b)    In no event shall the amount of interest due or payable hereunder exceed the maximum rate of interest allowed by applicable law, and in the event any such payment is inadvertently paid by the Borrowers or inadvertently received by the Holder, then such excess sum shall be credited as a payment of principal, unless the Borrowers shall notify the Holder, in writing, that the Borrowers elects to have such excess sum returned to it forthwith.  It is the express intent hereof that the Borrowers not pay and the Holder not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by the Borrowers under applicable law.

(c)     Whenever used in this Note, the words "Borrower" and "Holder" shall be deemed to include the Borrower and the Holder named in the opening paragraph of this Note, and their respective heirs, executors, administrators, legal representatives, successors and assigns.  It is expressly understood and agreed that the Holder shall never be construed for any purpose as a partner, joint venturer, co-principal, or associate of the Borrower, or of any person or party claiming by, through, or under the Borrower in the conduct of their respective businesses.

(d)     By accepting partial payment after the due date of any amount of principal of or interest on this Note, the Lender shall not be deemed to have waived the right either to require prompt payment when due and payable of all other amounts of principal of or interest on this Note or to exercise any rights and remedies available to it in order to collect all such other amounts due and payable under this Note. No modification, change, waiver or amendment of this Note shall be deemed to be made by the Lender unless in writing signed by the Lender, and each such waiver, if any, shall apply only with respect to the specific instance involve.

(e)     All references herein to any document, instrument, or agreement shall be deemed to refer to such document, instrument, or agreement as the same may be amended, modified, restated, supplemented, or replaced from time to time.  The pronouns used herein shall include, when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.  Time is of the essence of this Note.

(f)     This Note shall be construed and enforced in accordance with the laws of the State of Georgia.

WITNESS, the execution of this Note, under seal, by the Borrower.

SANSWIRE, INC.
a Delaware Corporation

By: _____
Michael K. Molen, President/CEO

# Exhibit "9"

BK 2 7 1 I 4 PG 0 1 8 1

FILED AND RECORDED
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA

02 APR 17 PM 2: 00

TOM LAWLER, CLERK

THIS DOCUMENT PREPARED BY
AND RETURN TO:
Jeff D. Woodward, Esq.
Foltz Martin, LLC
3525 Piedmont Road, N.E.
Five Piedmont Center, Suite 750
Atlanta, Georgia 30305

### DEED TO SECURE DEBT AND SECURITY AGREEMENT

THIS DEED TO SECURE DEBT AND SECURITY AGREEMENT (hereinafter referred to as this "Instrument") made and entered into as of the _____ day of April, 2002, by and between Dan L. Wilcox, a Georgia resident, party of the first part, as grantor (hereinafter referred to as "Owner"), and Peter Campbell, party of the second part, as grantee (hereinafter referred to as "Secured Party");

### W I T N E S S E T H :

1.01  THAT FOR AND IN CONSIDERATION of the sum of Ten and No/l00 Dollars ($l0.00) and other good and valuable considerations, the receipt and sufficiency whereof are hereby acknowledged, and in order to secure the indebtedness and other obligations of Sanswire, Inc., a Delaware corporation (hereinafter referred to as "Borrower") hereinafter set forth, Owner does hereby grant, bargain, sell, convey, assign, transfer, pledge and set over unto Secured Party and the successors, successors-in-title and assigns of Secured Party all of the following described land and interests in land, estates, easements, rights, improvements, fixtures, equipment, appliances and appurtenances (hereinafter referred to collectively as the "Premises"):

(a)  All those certain tracts, pieces or parcels of land more particularly described in Exhibit "A" attached hereto and by this reference made a part hereof (hereinafter referred to as the "Land").

(b)  All buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Land, and all gas and electric fixtures, radiators, heaters, engines and machinery, boilers, ranges, elevators and motors, plumbing and heating fixtures, carpeting and other floor coverings, fire extinguishers and any other safety equipment required by governmental regulation or law, washers, dryers, water heaters, mirrors, mantels, air conditioning apparatus, refrigerating plants, refrigerators, cooking apparatus and appurtenances, window screens, awnings and storm sashes, which are or shall be attached to said buildings, structures or improvements and all other furnishings, furniture, fixtures, machinery, equipment, appliances, vehicles (excluding Owner's personal automobiles, if any), building supplies and materials, warranties and other rights under construction, service and other contracts, books and records, chattels, inventory, accounts, farm products, consumer goods, general intangibles and personal property of every kind and nature whatsoever now or hereafter owned by Owner and located in, on or about, or used or intended to be used with or in connection with the use, operation or enjoyment of the Premises, including all extensions, additions, improvements, betterments, after-acquired property, renewals, replacements and substitutions, or proceeds from a permitted sale of any of the foregoing, and all the right, title and interest of Owner in any such furnishings, furniture, fixtures, machinery, equipment, appliances, vehicles and personal property subject to or

071688 -89

44

BK 27114 PG0194

Execution Copy

Instrument, the Premises or any document or instrument evidencing, securing or in any way relating to the Indebtedness; all without releasing, discharging, modifying, changing or affecting any such liability, or precluding Secured Party from exercising any such right, power or privilege or affecting the security title, security interest or lien of this Instrument. In the event of the sale or transfer by operation of law or otherwise of all or any part of the Premises, Secured Party, without notice, is hereby authorized and empowered to deal with any such vendee or transferee with reference to the Premises or the Indebtedness, or with reference to any of the terms, covenants, conditions or agreements hereof, as fully and to the same extent as it might deal with the original parties hereto and without in any way releasing and/or discharging any liabilities, obligations or undertakings.

3.16  Suits to Protect the Premises.  Secured Party shall have the power to institute and maintain such suits and proceedings as it may deem expedient (a) to prevent any impairment of the Premises by any acts which may be unlawful or constitute a Default under this Instrument, (b) to preserve or protect its interest in the Premises and in the incomes, rents, issues, profits and revenues arising therefrom and (c) to restrain the enforcement of or compliance with any legislation or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such enactment, rule or order would impair the security hereunder or be prejudicial to the interest of Secured Party.

3.17  Proofs of Claim.  In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other proceedings affecting Owner, its creditors or its property, Secured Party, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have the claims of Secured Party allowed in such proceedings for the entire amount of the Indebtedness at the date of the institution of such proceedings and for any additional amount of the Indebtedness after such date.

## MISCELLANEOUS

4.01  Successors and Assigns.  This Instrument shall inure to the benefit of and be binding upon Owner and Secured Party and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns. Whenever a reference is made in this Instrument to "Owner" or "Secured Party" such reference shall be deemed to include a reference to the heirs, executors, legal representatives, successors, successors-in-title and assigns of Owner and Secured Party, as the case may be.  The provisions of this Paragraph 4.01 are subject to the restrictions on transfer contained in Paragraph 2.17 hereof.

4.02  Terminology.  All personal pronouns used in this Instrument whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural, and vice versa. Titles of articles and paragraphs are for convenience only and neither limit nor amplify the provisions of this Instrument, and all references herein to articles, paragraphs or subparagraphs shall refer to the corresponding articles, paragraphs or subparagraphs of this Instrument unless specific reference is made to articles, paragraphs or subparagraphs of another document or instrument.

4.03  Severability.  If any provisions of this Instrument or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Instrument and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

4.04  Applicable Law.  This Instrument shall be interpreted, construed and enforced according to the laws of the State of Georgia.

4.05  Notices.  Any and all notices, elections, demands, requests and responses thereto permitted or required to be given under this Instrument shall be in writing, signed by or on behalf of the party giving the same, and shall be deemed to have been properly given and shall be effective upon being personally delivered, or upon being deposited in the United States mail, postage prepaid, certified with return receipt requested, to the other party at the address of such other party set forth below or at such other address within the continental United States as such other party may designate by notice specifically designated as a notice of change of address and given in accordance herewith; provided, however, that the time period in which a

14

BK 2 7 1 1 4 PG 0 1 9 5

Execution Copy

response to any such notice, election, demand or request must be given shall commence on the date of receipt thereof; and provided further that no notice of change of address shall be effective until the date of receipt thereof. Personal delivery to a party or to any officer, partner, agent or employee of such party at said address shall constitute receipt. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response, if given to Secured Party, shall be addressed as follows:

        Peter Campbell
        4708 Oak Park Road
        Raleigh, North Carolina 27612

and, if given to Owner, shall be addressed as follows:

        Dan L. Wilcox
        2264 Echo Trail
        Atlanta, GA 30345

with a copy to:

        Michael Molen
        3610 Mansions Parkway
        Berkley Lake, Georgia 30096

    4.06  Replacement of Note.  Upon receipt of evidence reasonably satisfactory to Owner of the loss, theft, destruction, total or partial obliteration, mutilation or inappropriate cancellation of the Note, or the placement of any inappropriate marking upon the Note, and in the case of any such loss, theft, destruction or total obliteration, upon delivery of an indemnity agreement reasonably satisfactory to Owner or, in the case of any such partial obliteration, mutilation, inappropriate cancellation or inappropriate marking, upon surrender and cancellation of the Note, Owner will execute and deliver, in lieu thereof, a replacement Note, identical in form and substance to the Note and dated as of the date of the Note and upon such execution and delivery all references in this Instrument to the Note shall be deemed to refer to such replacement Note.

    4.07  Greater Estate.  In the event that Owner is the owner of a leasehold estate with respect to any portion of the Premises and, prior to the satisfaction of the Indebtedness and the cancellation of this Instrument of record, Owner obtains a fee estate in such portion of the Premises, then, such fee estate shall automatically, and without further action of any kind on the part of Owner, be and become subject to the security title and lien of this Instrument.

    4.08  Assignment.  This Instrument is assignable by Secured Party, and any assignment hereof by Secured Party shall operate to vest in the assignee all rights and powers herein conferred upon and granted to Secured Party.

    4.09  Time of the Essence.  Time is of the essence with respect to each and every covenant, agreement and obligation of Owner under this Instrument, the Note and any and all other instruments now or hereafter evidencing, securing or otherwise relating to the Indebtedness.

    4.10  Further Stipulations.  [INTENTIONALLY OMITTED]

    4.11  Waiver of Owner's Rights.  BY EXECUTION OF THIS INSTRUMENT OWNER EXPRESSLY: (A)  ACKNOWLEDGES THE RIGHT OF SECURED PARTY TO ACCELERATE THE INDEBTEDNESS EVIDENCED BY THE NOTE AND ANY OTHER INDEBTEDNESS AND THE POWER OF ATTORNEY GIVEN HEREIN TO SECURED PARTY TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY OWNER WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE (IF ANY) AS IS SPECIFICALLY REQUIRED TO BE GIVEN UNDER THE PROVISIONS OF THIS INSTRUMENT; (B) WAIVES ANY AND ALL RIGHTS WHICH OWNER MAY HAVE UNDER THE CONSTITUTION OF THE UNITED STATES OF AMERICA (INCLUDING, WITHOUT

15

BK27114PG0196

LIMITATION, THE FIFTH AND FOURTEENTH AMENDMENTS THEREOF), THE VARIOUS PROVISIONS OF THE CONSTITUTIONS FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW, (i) TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY SECURED PARTY OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO SECURED PARTY, EXCEPT SUCH NOTICE (IF ANY) AS IS SPECIFICALLY REQUIRED TO BE GIVEN UNDER THE PROVISIONS OF THIS INSTRUMENT AND (2) CONCERNING THE APPLICATION, RIGHTS OR BENEFITS OF ANY STATUTE OF LIMITATION OR ANY MORATORIUM, REINSTATEMENT, MARSHALLING, FORBEARANCE, APPRAISEMENT, VALUATION, STAY, EXTENSION, HOMESTEAD, EXEMPTION OR REDEMPTION LAWS; (C) ACKNOWLEDGES THAT OWNER HAS READ THIS INSTRUMENT AND ANY AND ALL QUESTIONS OF OWNER REGARDING THE LEGAL EFFECT OF THIS INSTRUMENT AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO OWNER, AND OWNER HAS CONSULTED WITH COUNSEL OF OWNER'S CHOICE PRIOR TO EXECUTING THIS INSTRUMENT; AND (D) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF OWNER HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY OWNER AS PART OF A BARGAINED FOR LOAN TRANSACTION AND THAT THIS INSTRUMENT IS VALID AND ENFORCEABLE BY SECURED PARTY AGAINST OWNER IN ACCORDANCE WITH ALL THE TERMS AND CONDITIONS HEREOF.

**IN WITNESS WHEREOF**, Owner has executed this Instrument under seal, as of the day and year first above written.

Signed, sealed and delivered
this ___ day of April, 2002
in the presence of:

_____
Unofficial Witness

_____
Dan L. Wilcox

_____
Notary Public

My Commission expires:

Notary Public, Fulton County, Georgia
My Commission Expires September 18, 2004

**(NOTARY SEAL)**

(SEAL)

BK 27114 PG 0197

Execution Copy

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 288 & 299, 6TH DISTRICT, GWINNETT COUNTY, GEORGIA, BEING LOT 36, BLOCK A, UNIT III, RIVER MANSIONS AS RECORDED IN PLAT BOOK 44, PAGE 136, GWINNETT COUNTY RECORDS.

BK 2 7 1 1 4 PG 0 1 9 8

Execution Copy

**EXHIBIT "B"**

**PERMITTED ENCUMBRANCES**

1.      That certain Security Deed securing that certain Loan from Accredited Home Lenders, Inc., dated June 27, 2001 in the original principal amount of $360,500.

# Exhibit "10"

**Bank of America** | USA | **Customer Receipt**

All items are credited subject to verification, collection, and conditions of the Rules and Regulations of this Bank and as otherwise provided by law. Payments are accepted when credit is applied to outstanding balances and not upon issuance of this receipt. Transactions received after the Bank's posted cut-off time or Saturday, Sunday, and Bank Holidays, are dated and considered received as of the next business day.

Please retain this receipt until you receive your account statement.

Thank you for banking with Bank of America.
Try Online Banking at www.bankofamerica.com

WE HOPE YOUR
BANKING EXPERIENCE
WAS A
"10"
LET US KNOW!!
THANK YOU!!

DEPOSIT TICKET                              73
NGA  0101063   005   nbka68x   03/20/03
MNC 540560136 ACCT# 00685113309
03/20/03 15:08 PM          $15,000.00

CAMPBELL

95-14-2005B 06-2002

| | |
|---|---|
| Subj: | **Re: Campbell - Suggest immediate reading** |
| Date: | 3/20/03 10:51:51 AM Eastern Standard Time |
| From: | mmolen@sanswire.com |
| To: | Camp99999@aol.com |
| *Sent from the Internet (Details)* | |

Pete,

I'll make sure the deposit is made and the fax sent to you.  However, it might be closer to 1:30 by the time I get back to my fax machine.

I'll be free later in the afternoon to talk about the other business.

Take care.

MM

Michael K. Molen
CEO
Sanswire Technologies, Inc.


---------- Original Message --------------------------------
From: Camp99999@aol.com
Date:  Wed, 19 Mar 2003 14:36:39 EST

>Mike Molen:
>      I do not know to which Mike Molen this note will be received:
>              1) the one who tells me all is well, the money is transferred
>and I will          keep you informed   OR
>              2) the one who has excuses for not doing what he says he will do
>when             he says he will do them.
>      Whichever MM reads this memo, he should be advised that if the money
>is not transferred to my account by NOON tomorrow, a deposit slip faxed to me
>by 1 PM tomorrow (919-571-7010) and we have a phone conversation by 1 PM
>tomorrow, the agreement we had for me to suspend the foreclosure proceedings
>is null and void. It is a simple matter of you not doing what he said you
>would do.
>      I also suggest you send an Email to me suggesting when you would like
>to have our phone conversation.
>      Your call,  Mike #1 or Mike #2.
>      Pete c
>
>

---

Sent via the Webmail system at sanswire.net

Thursday, March 20, 2003     America Online: Camp99999

| Subj: | **monday** |
|---|---|
| Date: | 3/17/03 11:32:00 AM Eastern Standard Time |
| From: | mmolen@sanswire.com |
| To: | camp99999@aol.com |
| *Sent from the Internet (Details)* | |

Pete,

When I got to the office this morning, I had a message from the girl at the bank that has been helping me with the ACH issue.  She said that everything was worked (this was 3:24 on Friday).  The deposit might not show up yet since it was after 2:00 on Friday.

I'm headed out to a lunch meeting with a group that is in town today.  I have to go to the bank this afternoon for another matter and I'll confirm that all is done.

Take care.

MM


Michael K. Molen
CEO
Sanswire Technologies, Inc.


Sent via the Webmail system at sanswire.net

Mike,

Let me recap my position:

If you arrange the following I will suspend foreclosure proceedings on your house:

1) deposit $15,000 into my account on Tuesday or Wednesday of this week and call me to tell me this has been done.
2) Starting today, deposit 50% of funds collected from stock sales, deposits to buy stock in the future or any new monies connected with sale or planned sale and distribution of Sanswire stock or any stock related to a Sanswire derived stock, into my account on a day to day basis as it is collected. Insure a minimum of $3,000 is deposited into the account by Thursday, March 20, 2003.
3) Insure total deposits for period of March 21 to March 27 equal a minimum of $5,000.
4) Thirty days after the Sanswire merger with Indiginet or if the Indiginet merger does not take place then thirty days after Sanswire's merger with an unnamed company but no later than April 22, 2003 you will have collectively deposited a minimum $125,000 into my account.

I do not want to invalidate the Ten Day Cure Period that ended on February 14, 2003 and will have to talk to Jeff to see what additional agreement may need to be prepared and signed.

# Exhibit "11"

**Press Release**

# Sanswire and Pear Technologies Announce Merger Agreement

ATLANTA—May 20, 2002—Sanswire, Inc., (www.sanswire.com) an international, high-speed, wireless Internet service provider announced today that it has merged with Pear Technologies, Inc., a publicly held company in an "all stock" transaction. Pear Technologies will change its name to Sanswire Technologies, Inc. and begin trading its stock using the symbol SNWR on May 21, 2002. The company will simultaneously complete a 10 for 1 reverse split of its common stock.

Utilizing bandwidth provided by Worldcom (WCOM: Nasdaq), Sanswire provides wireless infrastructure to the business, hospitality, residential, and education sectors. The Company has recently begun a national rollout of its products and services and is planning to have wireless systems operating in the top 25 U.S. markets by the end of the first quarter of 2003. Subscribers will be able to roam about an entire city while staying connected to the Internet at high speed.

"The merger will help facilitate our plan to develop a national wireless network that will allow our subscribers to access the Internet at high speed from anywhere in the country through various wireless devices. Equipment manufacturers are now building laptop computers with wireless technology that use the same 802.11(x) protocol as our network. This confirms what we have been saying for the past three years; that we are approaching the time where the majority of Internet traffic will be over some kind of wireless device. Sanswire will be the vehicle that connects those devices to the Internet," said Sanswire's President, Michael K. Molen

For more information about Sanswire, visit the Company's website at www.sanswire.com or contact the Company's headquarters at 404-591-5800.

This press release discusses certain matters that may be considered "forward-looking" statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements regarding the intent, belief or current expectations of Sanswire Technologies, Inc. ("the Company") and its management. Prospective investors are cautioned that any such forward-looking statements are not guarantees of future performance and involve a number of risks and uncertainties that could materially affect actual results such as, but not limited to: the ability of the Company to raise necessary capital; to attract and retain effective management; or the failure of third-party contractors to perform their contractual obligations.

# Exhibit "12"

Subj: **update**

Date: 2/19/02 7:56:02 PM Eastern Standard Time
From: mmolen@sanswire.net (Michael Molen)
Reply-to: mmolen@sanswire.net
To: camp99999@aol.com

Pete,

I'm sorry it has taken so long to get back to you. I've been
traveling quite a bit the past month and haven't had a lot of time
in the office. I'll try to outline what all has been going on.

I met again Thursday in Sarasota with one of the gentlemen from
the group I told you about that is interested in investing in
Sanswire. When I met the group for dinner, they liked the idea
and wanted to do a little due-diligence on the Company prior to
committing. They have completed their due-diligence and have made
us an offer. It is a complicated offer that includes a stock
purchase now and warrants at various prices over the next 36
months. We are considering the offer. The main point that is
holding up our decision is that we want to make sure that we are
not setting a "precedent" concerning the price of the stock that
will affect the selling price at the time of our Offering. We
plan to get back to them with our answer by the end of the week.

We are also discussing a potential bridge loan from one of the
brokerage houses that we are dealing with. If we can put this
together, it will give us enough money to make a substantial
payment to both you and Spike. I'm not sure how long this will
take and will let you know more as we move forward.

The project in Miami that I was telling you about has come to
fruition. We landed the eight high-rise apartment buildings that
have over 2,000 tenants. Our engineers will be in Miami on Monday
to perform the site survey. This is a very lucrative deal for
Sanswire. The management company is considering providing the
service free of charge to the tenants. They (the management
company) would pay us a reduced rate for 100% penetration.

Diego Mantio, Captain of the Ecuadorian Navy will be in Atlanta
this Thursday to discuss moving forward with the project we
discussed when we were there in December. This is an exciting
project. We will be providing Internet access to 27 buildings at
the base in Salinas. In addition, they (the navy) are in the
process of giving laptop computers to the 400 students that attend
the school on the base and want them to be able to access the
Internet. This would be a very easy installation. They are
allowing us to install our transmitting antenna on the top of the
mountain that is next to the base. From this site, you can see
the entire base as well as most of Salinas. Salinas is a resort
town and looks like Miami with hotels lining the shoreline. Our
plan is to market our service to all of the hotels and apartments
that we can see from the tower site.

The General that we have been dealing with from Colombia is also in the United States this week and will be meeting with us before he returns to Cali. He is speaking at Harvard while he is here. They want additional information from us concerning the wireless network we discussed during our last trip to Colombia. We don't have anything in writing yet on the project, but we know they are not talking to anyone else. The General is a personal friend of Jorge Calderon's father. Jorge is Vice President of Latin American Operations for Sanswire.

Jairo Rivera, President of Latin American Operations for Sanswire is scheduling a trip to Ecuador to sign our agreement with PacificTel. PacificTel is the phone company in Ecuador and we are assisting them in retrofitting their phone system to accommodate high-speed Internet access. We only have a small piece of the project, but it is a very big project.

I will be in Jacksonville on Tuesday of next week to meet with the group we are working with on building out the downtown area of Jacksonville. When finished, subscribers will be able to go anywhere in the downtown area and stay connected to the Internet at extremely high-speed. This project is mentioned in one of the articles on our website (www.sanswire.net) and will be the pilot for our national rollout.

In the middle of all that is going on, our lease for our office space expires in four months. We have been in this location for five years. When we talked to our real estate agent, we found that there is a lot of sub-lease space available in our area at significantly reduced prices. We have narrowed our search to the building right across the expressway from where we are now. By moving, we can cut our rent almost in half and end up with more space than we have now. This is important because we will be adding an additional 10-12 people after the Offering and have no place to put them at the location we are in now. We have 11 people in this office now and could only add three more. It is not quite as nice but the savings and additional space is important.

I hope this long message didn't bore you. I wanted to let you know what all is going on.

Pete, I really appreciate your continued patience. I know that it is difficult and I assure you that we are doing everything we can to repay your loan.

Take care and have a blessed evening.

MM

# Exhibit "13"

Subj:      **FWD: update 9/14/01**
Date:      9/19/01 1:53:28 PM Eastern Daylight Time
From:   mmolen@sanswire.net (Michael Molen)
Reply-to:
To:    camp99999@aol.com

Pete,

Here is the update.  Yes, I think I sent it to Spike as well.

MM

Michael K. Molen
President/CEO
Sanswire.Net

----------- Original Message ---------------------------
From: "Michael Molen" <mmolen@sanswire.net>
Reply-To: <mmolen@sanswire.net>
Date: Thu, 13 Sep 2001 15:37:53 -0400

I hope you and your family are doing well.

I had planned to get this update out to you before now.  We have
many things happening at Sanswire and I want to update you as best
I can.

First and foremost, we continue to work on the merger and
subsequent Public Offering.  One reason I have held off on this
update is that I wanted to bring you the news that you have been
waiting for.  Even though I don't have that news today, I remain
optimistic that we will have that word soon.  We are doing
everything we can to facilitate this matter.  I know how important
this is to you and I assure you that it is also extremely
important to me.

The current state of the telecommunications industry coupled with
the tightening of the purse strings in the investment community
have not helped our efforts.  We have an issue that we are
attempting to resolve before we can move forward.  I know that it
seems like we always have delays, but I assure you that we
confront the reasons for the delays and work through them with all
resources available to us.

I am Sanswire's largest investor and I have all the incentive I
need to drive the Company to our goals.  When we first formed
Sanswire, we had many goals.  One was taking the Company public.
Even though this has not happened yet, we "have" reached some of
the other goals and have built the Company to a point that we are
able to get the attention of parties that are helping to increase
the value of Sanswire for all of us and move the Company toward
profitability.  It doesn't matter if we go public if the Company
is not also doing things that will generate revenues.  Once a

public company, we all want to see the stock rise and this will
only happen if we have a strong foundation and meet our
projections. We are doing this.

Therefore, it is very important that we all stay focused on the
big picture. I assure you that everyone at Sanswire understands
this and is giving 110% effort. We have eleven very dedicated
individuals that make up our team. Each has made many sacrifices
in their personal lives to assure the success of Sanswire. The
fact that we have not completed the merger and had the Offering is
not necessarily a bad thing. Yes, we all want it to happen, but
we don't just want Sanswire to be a public company, we also want
to maximize the value of our investment.

If you have followed past updates, you know that we are working
with two different municipalities to build an infrastructure that
will provide our wireless Internet access throughout their
cities. Subscribers will be able to go anywhere in town and
remain connected to the Internet.

It has been our (long term) plan to roll this idea out on a
national basis, thus allowing subscribers to go anywhere in the
country and remain connected. To do this, we need the help of our
strategic partners.

I was contacted recently by an investment firm in New York
concerning this project. I have had follow up discussions with
others at the firm and there seems to be an interest in providing
us with the necessary capital to launch this project. However, a
project of this scope will take much more than capital. We have
also had discussions with our bandwidth provider (Worldcom) about
this project and they are also interested in participating in some
fashion. The third and most important piece is American Tower.
They own and operate over 14,000 cellular towers across the United
States that we would like to use. We would install one of our
radios and an antenna on each one of these towers. This would
cover approximately 82% of the country.

If we get a firm commitment from any one of these companies, I
feel like the others will follow. We would start with the top 25
markets and then move to the secondary cities and so on. Everyone
agrees that this would do to the Internet business what "no
roaming and long distance charges" did to the cellular industry.
A subscriber would be able to open their laptop anywhere in the
country and be connected to the Internet at high speed.

Jairo Rivera, President of Sanswire's Latin American Operations is
back from Ecuador. We still have not signed that Agreement. We
are waiting on our partners there to complete their part and then
Jairo will return to sign the Agreement. This will receive a lot
of publicity in Ecuador and I will forward any press coverage to
you.

We have hired the former Florida sales representative of Reflex
Communications. Claudia will handle all sales in Florida and will
report directly to Todd Kice, our National Sales Director.
Claudia is very energetic and has made several sales since joining
our staff. She is located in Miami and has many contacts with
apartment and condo owners that she is working with.

I was in Jacksonville last week and met with eight hotel owners that represent 22 hotels (all in Florida). We gave a Power Point presentation as well as a live "wireless" demonstration. I am optimistic that we will land the majority of the properties.

Our merchant account is finally open and functional. We can now implement our billing software at the properties we currently have up and running. This will make the task of collecting subscription fees much easier. Now, when a subscriber turns on their computer at one of our properties, they will be able to use their credit card to gain access. This is very important for the following reason:

Since day one, we have said that the 802.11b protocol will someday be the standard in the industry. We were right. Equipment (laptop) manufacturers are now installing wireless technology and hardward on their new models that will allow users to access our wireless networks without using one of our wireless cards. If they are in one of our properties and they see that there is wireless Internet access, all they have to do is turn on their computer and they will come to a splash page welcoming them to the property and inviting them to use the service. If they chose to use the service, they are taken to a sign on page where they enter their credit card information and they are immediately connected. I think this is what caught the eye of the investment firm in New York.

Before I close, I have a little bad news. We entered into an Agreement with a company called Copia Communications to secure business for Sanswire in Jamaica. I have been to Jamaica and met with businesses and individuals interested in our service there. We introduced and trained this company on wireless Internet access. We have supplied representatives of Copia with Sanswire Business Plans and business cards. They have used Sanswire's website to secure business there. One property we had worked with and got as far as submitting our Subscription Agreement to was the Ritz Carlton Hotel in Montego Bay. This is a very nice property and would be a great reference for Sanswire. We even went as far as securing the necessary equipment to build out that hotel.

A few weeks ago, I received word that Copia has ignored our Agreement and entered into a deal with a former equipment provider of ours (that we introduced them to) to provide wireless Internet access at the Ritz Carlton in Montego Bay. Of course we have Agreements in place with both companies that prevent this kind of backdoor activity. However, greed will make people do odd things.

We have met with our attorneys and are preparing to take the necessary action to protect our interest there. This will involve Copia, the equipment provider and the Ritz Carlton. I will keep you posted on the progress of our actions.

Have a wonderful day.

God bless America!

Michael

# Exhibit "14"

| | |
|---|---|
| Subj: | **Molen shocked** |
| Date: | 10/31/02 6:55:54 AM Pacific Standard Time |
| From: | mmolen@sanswire.com (Michael Molen) |
| Reply-to: | mmolen@sanswire.com |
| To: | Camp99999@aol.com |

Pete,

I have been doing everything in my power to come up with the money to repay your loan. I have also been working 12 hour days to keep my business going so that we "all" succeed.

Just because I have not called you since Monday night does not mean that I am ignoring my commitment to you. During our last conversation I agreed to initiate the process of securing a second mortgage on the house. I have done this. It is not a process that can happen in three days.

I cannot believe that you are saying that you are having Jeff initiate "foreclosure" proceedings. If you will remember, you looked me in the eye and told me that you would "not" take my house if I pledged the equity to you. I took you at your word or I would "never" have done that. However, I also remember you promising me that you would not use Jeff Woodward on "any" business between you and I. As you know, you didn't live up to that promise.

I spend "every" day of my life whoring myself to investors to keep the door at Sanswire open. I have your best interest in mind as well as everyone else that has believed in me.

And now with everything else that is going on in my life, you are going to have this scum-bag, inept attorney file foreclosure on my home. And as to put salt in that wound, you make sure to tell me that he will be contacting my wife at home. What good does that do? Is she on the Note? Is she on the mortgage? This is only meant to hurt her and to cause problems within my family. An attempt to pressure me into doing something that I have already agreed to do. Pete, you can't blame this one on Jeff. You are responsible for the actions of your attorney. I never thought that you would do something like this. You know the unstable position that my wife is in and what all she is going through.

Is the $150K the only thing that matters to you? Wouldn't you like to see Sanswire successful? Do you really think that I will care about protecting your interests in Sanswire if you crush my wife and steal my house?

If it sounds like I'm upset, I am. As you know, I have an extremely unstable situation in my home right now and when someone that I have trusted at his word threatens to "take" my home, it upsets me. I guess the $150K is more important to you than doing what is right. This isn't right and you know it. Don't fall for Jeff's scum-bag intimidating tactics. You are a better person than that. At least I thought you were.

I also thought that our relationship was a little more than just business. I've considered you a friend as well as a business associate. Apparently, I was wrong about that too.

How about giving me time to work this out. Don't tell me on Monday night that you need for me to do this and then on Thursday night tell me that you are going to "foreclose" on my house, and contact my wife if I don't have it resolved in 24 hours.

As I said, I have initiated the process. I need some time to finish it. I have a meeting today with Dan Wilcox this matter. How about giving me time to do what I have agreed to do?

MM


Michael K. Molen
CEO
Sanswire Technologies, Inc.

# Exhibit "15"

Page 10

# SALARY CALCULATIONS

## CORPORATE OFFICE

### MONTHS 1 - 12

| | Yearly Salary | MONTH 1 | MONTH 2 | MONTH 3 | MONTH 4 | MONTH 5 | MONTH 6 | MONTH 7 | MONTH 8 | MONTH 9 | MONTH 10 | MONTH 11 | MONTH 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CEO | @ 200,000 = | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 |
| PRESIDENT | @ 150,000 = | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| CFO | @ 120,000 = | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Comptroller | @ 100,000 = | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 |
| Bookkeepers (add 1 every quarter) | @ 35,000 = | 2,917 | 2,917 | 2,917 | 5,833 | 5,833 | 5,833 | 8,750 | 8,750 | 8,750 | 11,667 | 11,667 | 11,667 |
| COO | @ 120,000 = | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Regional Operations Manager (1 for every 4 airships) | @ 90,000 = | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 15,000 |
| CTO | @ 120,000 = | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Sr. RF Engineer (2) | @ 90,000 = | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| RF Engineer (start with 2; add 1 every 6 months) | @ 65,000 = | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 |
| Sr. IT Engineer (add 1 every 6 months) | @ 90,000 = | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| IT Engineer (start with 2; add 1 every 6 months) | @ 65,000 = | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 | 16,250 |
| Sr. Research & Development Engineer | @ 90,000 = | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 |
| R&D Engineer (add 1 R&D Begin after 3 months, then 1 every 6 months) | @ 65,000 = | | | | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 10,833 | 10,833 | 10,833 |
| Technical Support Manager–Level 3 (start with 5, then add 1 for each airship launched) | @ 80,000 = | 33,333 | 33,333 | 66,667 | 66,667 | 66,667 | 100,000 | 100,000 | 100,000 | 133,333 | 133,333 | 133,333 | 166,667 |
| V.P. SALES & MARKETING | @ 100,000 = | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 |
| Regional Sales Mgr (1 per launch area) | @ 75,000 = | 6,250 | 6,250 | 12,500 | 12,500 | 12,500 | 18,750 | 18,750 | 18,750 | 25,000 | 25,000 | 25,000 | 31,250 |
| Customer Service Mgr. | @ 40,000 = | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 |
| PUBLIC RELATIONS MANAGER | @ 60,000 = | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| HUMAN RESOURCES MANAGER | @ 75,000 = | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 |
| Human Resources staff (add 1 every 6 months) | @ 35,000 = | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 2,917 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 |
| INVESTOR RELATIONS MANAGER | @ 75,000 = | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 |
| LEGAL | @ 75,000 = | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 |
| RECEPTIONIST (add 1 each year) | @ 25,000 = | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 |
| WEB DESIGNER (add 1 each year) | @ 40,000 = | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 |
| ADMINISTRATIVE ASSISTANTS (4) | @ 35,000 = | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 |
| **YEAR ONE TOTALS** | | 224,583 | 224,583 | 264,167 | 272,500 | 272,500 | 312,083 | 336,250 | 336,250 | 375,833 | 384,167 | 384,167 | 431,250 |